Filed 9/15/21  In re E.E. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re E.E., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E077104 |
| Plaintiff and Respondent, | (Super.Ct.No. J284845) |
| v. | OPINION |
| C.P., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Tracy M. De Soto, under appointment by the Court of Appeal, for Defendant and Appellant.

Michelle D. Blakemore, County Counsel, and Svetlana Kauper, Deputy County Counsel, for Plaintiff and Respondent.

1

Mother appeals from the termination of her parental rights to her minor daughter, E.E. Mother argues that the juvenile court erred by failing to apply the parental bond exception under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) (unlabeled statutory references are to this code). We affirm.

BACKGROUND

A. *Dependency History*

In April 2020, mother had five children, of whom four-year-old E.E. was the youngest. Mother did not have custody of any of E.E.'s older siblings.

Mother's oldest child was born in 2003. Mother was unable to provide appropriate supervision, guidance, or a stable home for that child, so she supported the child's godparents' petition in probate court to become the child's legal guardians, which was granted.

In 2010, the juvenile court sustained a section 300 petition as to two other children on the basis of mother's substance abuse. Mother failed to comply with reunification services. The case was terminated in 2011, with juvenile custody orders granting the father of those children sole physical custody but joint legal custody with mother. In 2013, mother's parental rights were terminated as to the fourth child after mother failed to comply with reunification services.

Then, in 2016, when E.E. was approximately one year old, a dependency petition was filed as to E.E. in Los Angeles County on the basis of father's substance abuse and the parents' history of engaging in domestic violence. The allegations were sustained.

2

Mother participated in family maintenance services, and the father was bypassed for reunification services.

B.  *Present Case*

San Bernardino County Children and Family Services (CFS) received a referral as to E.E. on April 9, 2020, when E.E. was four years old.  Mother had left E.E. with a friend in late March 2020.  After having E.E. for a couple of days, the friend gave E.E. to E.E.'s maternal grandmother on March 25, 2020.  The next day, mother was arrested for possession of a stolen vehicle but was released from custody shortly thereafter.  Maternal grandmother had E.E. in her custody for almost three weeks.  Maternal grandmother did not have contact information for mother.  When maternal grandmother first started caring for E.E., mother contacted maternal grandmother every second or third day, but the contact subsequently became less frequent.  Maternal grandmother was unable to continue caring for E.E., so on April 13, 2020, maternal grandmother gave E.E. to another relative (mother's step-aunt), Mrs. G.  Mrs. G. did not have any contact information for mother.

Maternal grandmother expressed concern for E.E.'s safety because mother would "often leave [E.E.] with different people for several days [or] weeks at a time."  Mother also would contact maternal grandmother to ask for money for a motel room to house herself and E.E.

The day after maternal grandmother gave E.E. to Mrs. G., a social worker spoke with mother, who confirmed that she had left E.E. with a friend and was then arrested.  Mother was homeless, refused to disclose her location to the social worker, and believed

3

that E.E. was staying with maternal grandmother. Mother was not aware that maternal grandmother had given E.E. to another relative. Mother did not make arrangements to pick up E.E. upon release from custody because mother considered herself unstable, and she advised the social worker that she remained unable to care for E.E.

The social worker also met with E.E., who was staying with Mr. and Mrs. G. E.E. reported that she had previously lived with her grandmother and had not seen her mother for a while but wanted to see mother. E.E. reported that mother sometimes disciplined her by hitting her hard on her arm, leaving a mark. Being hit would cause E.E. to cry. E.E. liked staying with Mr. and Mrs. G. and was happy in their home.

CFS temporarily detained E.E. and placed her in Mr. and Mrs. G.'s custody. CFS filed a dependency petition under section 300, alleging that mother and father failed to protect E.E. (§ 300, subd. (b)), father failed to provide E.E. with support (§ 300, subd. (g)), and E.E.'s siblings had been abused or neglected by mother (§ 300, subd. (j)). Mother did not attend the detention hearing. The juvenile court detained E.E. and ordered once weekly supervised visits with mother.

In June 2020, CFS reported that mother had been visiting with E.E. by telephone and that the visits were going well. Mrs. G. believed that mother was in jail, but CFS could not confirm.

Two months later, CFS reported that mother had been detained in El Centro, California. Mother refused to disclose to CFS why she was in custody. Mother was released from custody in late October 2020 and immediately enrolled in a 12-month residential drug treatment program.

4

E.E. continued to do well in the home of Mr. and Mrs. G. They were happy to have E.E. in their home and were willing to adopt her.

At a contested jurisdiction and disposition hearing held in November 2020, the juvenile court sustained the allegations in the petition, removed E.E. from parental custody, and bypassed reunification services for mother and father under subdivisions (b)(10) through (b)(13) of section 361.5. E.E. was declared a dependent and continued to be placed with Mr. and Mrs. G. Mother was allowed once monthly supervised visits with E.E. The court set the selection and implementation hearing for March 2021.

For that hearing, CFS reported that E.E. appeared happy and well-adjusted in her placement with Mr. and Mrs. G. She was attending kindergarten online because of the COVID-19 pandemic and was doing well. She had received all positive marks on her report card. E.E. said that she liked doing math.

Mr. and Mrs. G. had known E.E. since birth and wanted to adopt her. They described their relationship with her as "a typical parent/child relationship." E.E. mostly called Mr. and Mrs. G. "'aunt' and 'uncle'" but sometimes referred to them as her parents when speaking with others about them.

The social worker reported that after mother was released from custody she visited with E.E. monthly and spoke regularly with E.E. on the telephone. The social worker described the visits as "appropriate and loving."

The social worker asked E.E. how she felt about adoption, and E.E. "stated that if she could, she would like to live with her mom and dad, but since they cannot take care of her, she wants to live with her aunt and uncle 'forever.'" E.E. wanted to continue

5

talking to mother and sometimes visiting with her.  The social worker believed that terminating mother's parental rights would not be detrimental to E.E.

Mother testified at the selection and implementation hearing in May 2021.  Mother explained that because of the COVID-19 pandemic, she could visit only by telephone or video conference starting in April 2020.  The phone calls lasted from 10 to 30 minutes.

Mother was incarcerated from mid-June 2020 through late October 2020.  During that period, mother's only contact with E.E. was by phone and through written correspondence.  Mother spoke with E.E. every other day.  Mother played tic-tac-toe with E.E. in written correspondence.

Starting in late November 2020, mother visited with E.E. in person once per month.  The first visit lasted the whole day, and the visits thereafter were about four hours long.  Mother never missed an in-person visit.

E.E. usually visited mother at the women's home where mother lived, but they would leave to go to the park and to eat.  Mother once visited E.E. at the caregivers' home.  During their visits, mother read to E.E., and she and E.E. painted rocks together.  Over the holidays, mother and E.E. exchanged gifts, and a couple of weeks after Easter mother took E.E. to a park for an Easter egg hunt.  During their last visit, mother took E.E. (along with E.E.'s caregiver) to get E.E.'s ears pierced.  Mother helped E.E. with a school project during one visit, but mother did not know what school E.E. attended.

Mother said that at the beginning of their visits E.E. was always "really happy and excited" to see her.  E.E. called her "'Mommy,'" and the two would hug and kiss.  When

6

and if E.E. exited the car when they initially saw one another, E.E. would run to mother. E.E. would get "a little sad" when the visits ended.

Mother visited with E.E. by video about three times per week. Mother would read books to E.E. before E.E. went to bed. Mother believed that all of E.E.'s needs were being met by her caregivers, but mother nevertheless would send E.E. various items, such as party decorations for an upcoming birthday, a dress, puzzles, and snacks.

Mother explained that she believed she had occupied a parental role in E.E.'s life since E.E.'s removal. At one point, E.E.'s caregivers disciplined her by taking an electronic device away, and they told E.E. to talk to mother about it. Mother admonished E.E. not to do whatever behavior resulted in the discipline. Mother said that she had been consulted before E.E. got her hair cut and her ears pierced and about a surgery E.E. needed to remove an extra tooth. Before mother ended a telephone conversation with E.E., mother reminded E.E. to say "'please'" and "'thank you'" and to be nice.

The juvenile court found E.E. likely to be adopted, and the court terminated mother's parental rights.[1] As to the parental bond exception, the court found that "prong one is met" but found that mother failed to carry her burden of proving that E.E. would "suffer severe harm" or detriment if mother's parental rights were terminated.

## DISCUSSION

Mother argues that the juvenile court erred by terminating her parental rights, because the parental bond exception applied. We are not persuaded.

---

[1] The juvenile court also terminated father's parental rights. Father is not a party to this appeal.

7

When the juvenile court finds that a dependent child is likely to be adopted, it must terminate parental rights and select adoption as the permanent plan unless it finds that adoption would be detrimental to the child under one of several exceptions. (§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 630-631 (*Caden C.*).) The exceptions allow "'the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Caden C.*, *supra*, at p. 631, quoting *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

Under the parental bond exception, the parent bears the burden of proving three elements by a preponderance of the evidence: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, 636 [construing § 366.26, subd. (c)(1)(B)(i)].)

We review for substantial evidence the juvenile court's findings on whether the parent has regularly visited and whether a beneficial parental relationship exists. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) Whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship is a discretionary decision that we review for an abuse of discretion. (*Id.* at p. 640.) But we review any factual findings underlying that decision for substantial evidence. (*Ibid.*)

When "assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 632, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

The parent must show that his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, at p. 575.) "A showing the child derives some benefit from the relationship is not a sufficient ground to depart from the statutory preference for adoption." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 646, disapproved on other grounds in *Caden C.*, at pp. 637, 638, fns. 6, 7.) In determining whether severing the parental relationship would be detrimental, the court may consider issues ranging from "the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be." (*Caden C.*, at p. 640.) The court must also assess "how a prospective adoptive placement may offset and even counterbalance those harms," and in that regard the court may consider "findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told." (*Ibid.*)

In determining whether the parental bond exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575; *Caden C.*, *supra*, 11 Cal.5th at p. 633.)

The trial court did not abuse its discretion by concluding that the parental bond exception did not apply. No party challenges the trial court's finding that mother maintained regular visitation and contact with E.E., and we agree that the finding is supported by substantial evidence. But assuming for the sake of argument that the record supports a finding that E.E. derived some benefit from continuing her relationship with mother, the juvenile court did not abuse its discretion by determining that any benefits derived from that relationship did not "outweigh[] 'the security and the sense of belonging a new family would confer.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)

Substantial evidence showed that mother shared an appropriate, loving, and affectionate relationship with E.E. and that E.E. was emotionally bonded with mother to some degree. But contrary to mother's suggestion, there was no evidence that the relationship was so significant on its own to outweigh the security and the stability of an adoptive home. (Cf. *Caden C.*, *supra*, 11 Cal.5th at pp. 633-634 ["When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent"]; *id.* at p. 635 [when a child has "'very strong ties'" with a parent and termination of parental rights "'is likely to be harmful to the child, courts should retain parental ties if desired by both the parents and the child'"].) E.E. expressed excitement when visiting mother and, by mother's account, "a little sad[ness]" at the end of visits. Moreover, while E.E. expressed a desire to live with mother if possible, she also wanted to live with Mr. and Mrs. G. forever. This evidence demonstrates that the parent-child relationship, though beneficial to E.E., was not so

10

strong as to outweigh the countervailing benefits of security and stability provided by an adoptive home.

In addition, mother did not present any evidence that E.E. would be greatly harmed by severance of the parental relationship, or that the security and stability of a new home would not outweigh the loss of this relationship. Though E.E. was sad when her visits with mother ended, there was no evidence that her sadness was severe or prolonged. There was also no evidence that such sadness adversely affected E.E.'s behavior or general emotional well-being. (Cf. *Caden C.*, *supra*, 11 Cal.5th at p. 633 [losing the parental relationship might result in "emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression"].) On the contrary, the evidence demonstrates that E.E. was thriving in her placement with Mr. and Mrs. G. She liked living with them, the social worker consistently described E.E. as a happy child throughout her placement with them, and E.E. was doing well in school, despite the challenges presented by the COVID-19 pandemic. Moreover, there was affirmative evidence in the form of the social worker's opinion that termination of mother's parental rights would not be detrimental to E.E.[2]

---

[2] Mother's reliance on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) is misplaced. In that case, there was evidence (apart from the parent's testimony) that termination of parental rights would be detrimental. For example, one of the social workers who had observed the father and the child together during numerous visits testified that the child would suffer a "'huge detriment'" at the loss of the parent-child relationship, and a bonding study concluded that there was the potential for harm if the relationship was severed. (*Id.* at p. 295; see also *In re C.F.* (2011) 193 Cal.App.4th 549, 558-559 [ "*S.B.* is confined to its extraordinary facts" and "does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child

For all of these reasons, we conclude that the juvenile court did not abuse its discretion by concluding that the benefit E.E. would receive from adoption was not outweighed by any detriment E.E. might suffer from the termination of mother's parental rights.

DISPOSITION

The May 20, 2021, order terminating mother's parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ_____<br>J.

We concur:

MILLER_____
    Acting P. J.

RAPHAEL_____
            J.

---

derives some measure of benefit from maintaining parental contact"]; Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2021) § 2.171[5][i][C], p. 2-694 [*S.B.* should be viewed as a "the result of a very unique factual situation"].)